**OURSTAFF, INC., Petitioner,**

v.

**PENNSYLVANIA DEPARTMENT OF LABOR AND INDUSTRY, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 25, 2000.

Decided April 7, 2000.

---

Eugene N. McHugh, Harrisburg, for petitioner.

Jane C. Pomerantz, Harrisburg, for respondent.

Before PELLEGRINI, J., FLAHERTY, J., and McCLOSKEY, Senior Judge.

PELLEGRINI, Judge.

Ourstaff, Inc. (OSI) petitions for review of the Department of Labor and Industry's (Department) decision denying a request for a review and redetermination of its 1994 unemployment compensation contribution rate because the notification period of Section 301(j) of the Unemployment Compensation Act [1] (Act) does not apply to "estimated" contribution rates or when there is no revision to an employer's "official" contribution rate.

The facts of this case are not in dispute. On January 1, 1994, OSI, an out-of-state corporation in the business of employee leasing, acquired all of the business assets held in Pennsylvania by Transworld Investment Corporation (Transworld), a corporation which had been involved in employee leasing in the state since 1993 and, consequently, had been making employer contributions to the state's unemployment compensation fund. Under the state system for employer contributions, companies which regularly contribute to the fund receive a lower "experienced based" contribution rate that decreases the amount of money the employer must contribute to the fund each year.[2] This lower contribution rate can be transferred between companies when a successor corporation acquires all of the assets of a similar predecessor corporation.[3] To accomplish the transfer, the successor corporation must apply to the Department's Bureau of Employer Tax Operations (Bureau) for a reassignment of the predecessor corporation's experience record and reserve account balance to the successor corpora-

---

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937), *as amended*, 43 P.S. § 781(j). Section 301(j) provides:

   If the department finds that it has erroneously notified an employer that his rate of contribution is less than the rate to which he is entitled, he shall be notified of the revision of his rate and he shall be required to make payment of additional contributions on the basis of the revised rate: *Provided, [T]hat no such additional contribution shall be required unless the employer is notified of his revised rate not later than December thirty-first of the calendar year to which the rate is applicable,* unless the department finds that the employer has directly or indirectly contributed to the error[.] [Emphasis added.]

2. *See* Section 301(a)(1) of the Act. The experience based rate is determined by the amount of previously paid contributions held in employer's reserve account, the positive payment record of the employer and the state's adjustment rates.

3. *See* Section 301(d) of the Act. Section 301(d) provides that an employer who transfers its organization, trade or business, in whole or in part, to a successor-in-interest who continues essentially the same business activity of the whole or part transferred, may apply for transfer of the whole, or appropriate part, of the experience record and reserve account balance of the preceding employer to the successor-in-interest, including credit for the years during which contributions were paid by the preceding employer.

tion, and after an investigation required under Section 301(d)(1)(A),[4] the Bureau must promptly notify the successor employer of its contribution rate.[5]

Applying as a successor corporation to Transworld, OSI registered with the Bureau for a transfer of Transworld's contribution rate. While it was investigating the transfer, the Bureau assigned OSI an "estimated" 1994 contribution rate of .030109 for use in OSI's quarterly reports and payments to the fund pending a final determination of its "official" contribution rate. On November 1, 1995, upon completion of the transfer investigation, the Bureau sent OSI a contribution rate notice assigning it an official contribution rate of .038255 for 1994, requiring OSI to pay an additional $139,470.54 into the fund due to the difference between the estimated rate and the official rate listed on the contribution rate notice.

Contending that under Section 301(j) of the Act, the Bureau could not revise its estimated contribution rate after December 31, 1994, OSI appealed through the first and second level administrative appeals within the Department. Both appeals resulted in a denial of a review and redetermination of the 1994 rate because the Bureau interpreted Section 301(j) not to apply to "estimated" rates, and given that the only "official" contribution rate on November 1, 1995, was not revised, the notice provisions of Section 301(j) did not apply. OSI appealed to the Secretary of the Department (Secretary) and a hearing was held.

At the hearing, Douglas Bell (Bell), President of OSI, testified on behalf of the corporation. He stated that when OSI was required to file its first quarterly reports with the Bureau, he contacted them by telephone and was told to use the lower .030139 estimated contribution rate because that was the 1994 contribution rate assigned to Transworld. He testified that thereafter, the Bureau provided the quarterly report forms which indicated that the contribution rate was "estimated," but that he did not believe the rate could be later revised because letters from the Bureau in 1995 indicated it was OSI's "contribution rate" without specifying it was not official.[6] He stated that if the revision was allowed, OSI would suffer damages because it had relied on the contribution rate as given by the Bureau to determine the terms of its contracts with the companies to whom employees were leased, which could not be changed 11 months after the close of the year.

In response, R. Scot Miedrich (Miedrich), the Assistant Director for the Tax Accounting Division of the Bureau, testified on behalf of the Bureau. He stated that the Bureau could not have notified OSI of its official contribution rate in 1994 because after Transworld was notified on December 28, 1994, that its contribution rate for 1994 would be .038255, Transworld had challenged that contribution in an agency appeal arguing that it should have a lower rate because it had successor status to a third company, Gelrod Fox & Company (Gelrod). Because the status of Transworld's contribution rate was in dispute, Miedrich testified that the Bureau

4.  Section 301(d)(1)(A) of the Act requires a contribution rate to be determined based on the provisions of the Act, requiring calculation of the experience rating of the predecessor employer, determination of whether the successor corporation is continuing essentially the same business activity, and whether the predecessor corporation has any outstanding penalties or payments pending before transfer can be approved.

5.  Section 301(e)(2) of the Act provides: "The department shall promptly notify each em-

ployer of his rate of contribution for the calendar year[.]"

6.  To support this contention, OSI submitted into evidence three letters written by employees of the Department indicating that OSI had a "1994 Pennsylvania Unemployment Compensation Tax rate of .030139" without specifying that this rate was an estimate, was not official and could be changed. The letters were written to OSI in 1995.

could not determine OSI's official contribution rate until November 1, 1995, when Transworld's 1994 contribution rate was finally settled based on a finding that Transworld could not be a successor to Gelrod which was in the accounting business and not an employee leasing business. During the interim period when the successor status of OSI could not be determined, Miedrich testified that it was necessary to assign OSI an "estimated" contribution rate which was based on Transworld's contribution rate.

As to the Bureau's use of estimated contribution rates, Miedrich testified that the "estimated" contribution rates assigned by the Bureau could not be the same as the "official" contribution rates determined after a thorough Bureau investigation as required under Section 301(d)(1)(A) of the Act and sent on the Bureau's "Contribution Rate Notice, Form UC–657 or UC–657M." He stated that the quarterly reports issued by the Bureau notified every employer that the estimated rates were not the same as contribution rates issued on the rate notice form, and that additional payments might be required if the official contribution rate was higher then the estimated rate.[7] Miedrich testified that the estimated contribution rate was created for administrative purposes to permit the timely deposit of money into the unemployment compensation fund and to allow for the timely tax credit relief of employers when filing their federal unemployment compensation tax returns while their contribution rates were under investigation. Because estimated contribution rates were not based on the Bureau's investigation, Miedrich testified that the Bureau did not interpret Section 301(j) to apply, and that given that OSI's official contribution rate was never revised, Section 301(j) did not apply.

Concluding that Section 301(j) did not apply to "estimated" contribution rates because they were created out of administrative necessity, while a full investigation into the official contribution rate was conducted pursuant to the requirements of Section 301(d)(1)(A) of the Act, the Secretary denied OSI's review and redetermination because the "official" contribution rate received on November 1, 1995, was never revised so the notice period of Section 301(j) of the Act did not apply. This appeal followed.[8]

On appeal, OSI contends that the Secretary committed an error of law by interpreting Section 301(j) of the Act not to apply to "estimated" contribution rates. By arguing that Section 301(j) of the Act applies to "estimated" contribution rates,

7. The Bureau entered into evidence Departmental form UC–2, the form sent by the Bureau to Employer and other new employers for use in their quarterly reports and payments into the unemployment compensation fund. Next to the contribution rate given by the Bureau was the word "ESTIMATED." On the back of that document, a paragraph explained the nature of the "estimated" contribution rate as follows:

   EMPLOYER'S CONTRIBUTION RATE
   The Department's official notification of an Employer's Contribution Rate is the issuance of the Contribution Rate Notice, Form UC–657 or UC–657M. Pending the official rate notification, certain employers, usually those recently registering their accounts for Pennsylvania Unemployment Compensation purposes, may be provided an estimated rate for purposes of filing and paying quarterly tax returns by the imprinting of the word "(ESTIMATED)" above the Employer's Contribution Rate on the UC–2, and preceding the Contribution Rate on the UC–2A and 2B sections of the report. Receipt of a Contribution Rate Notice, UC–657 or UC–657M, that reflects a rate(s) that is different from an estimate *will be resolved by either billing for any additional amount due, or the refund of any overpayment[.]* [Emphasis added.]

8. Our scope of review is limited by Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704, to determining whether the necessary findings of fact are supported by substantial evidence, whether the Department committed an error of law, or whether the petitioner's constitutional rights were violated. *Zotis Enterprises v. Department of Labor and Industry*, 160 Pa.Cmwlth. 568, 635 A.2d 698 (1993), *petition for allowance of appeal denied*, 539 Pa. 662, 651 A.2d 547 (1994).

OSI asserts that the Secretary erred in finding estimated contribution rates are different from "official" contribution rates, and that the Bureau exceeds its authority by issuing the "estimated" contribution rates only to later issue an "official" contribution rate outside of the time limits of Section 301(j). In response, the Department contends that the Secretary did not err in interpreting Section 301(j) to exclude "estimated" contribution rates as those rates are created pursuant to administrative policymaking to only apply during the interim period while the Department conducts the investigations required to determine the official contribution rate.[9]

■ Because nowhere in the Act are the terms "estimated" or "official" contribution rates delineated, we must determine whether the power to utilize them can be inferred from the Act when an employer is seeking to transfer a predecessor's contribution rate. In such situations, Section 301(d)(1)(A) of the Act requires the Bureau to conduct an investigation to establish whether an employer seeking to gain a lower rate as a successor business has met the requirements for that status. As part of that investigation, the Bureau must determine whether the successor is continuing essentially the same business activity as the predecessor, assess the experience record and reserve account of the predecessor so that the correct contribution rate will be transferred to the successor corporation, verify that the transfer applications with supporting documents have been filed by both the successor corporation and predecessor corporation, and confirm that all

contributions, interest and penalties owing by the predecessor have been paid before the transfer application is approved. 43 P.S. § 781; see also 34 Pa.Code §§ 63.11–14. It is only after this lengthy legislatively required process is completed that the Bureau may then determine an employer's official contribution rate and approve the transfer application.[10] Under the legislative scheme then, there must be an interim rate, i.e., an "estimated" contribution rate, while the transfer application is being investigated for approval or disapproval. Because "estimated" contribution rates are not determined according to the requirements of Section 301(d)(1)(A) and are not issued upon acceptance of an approved application for transfer, they cannot become "official" contribution rates simply by a delay in notification caused by the investigation of the Bureau into the correct official contribution rate as required under the Act.

■ Given that "estimated" contribution rates are not the same as "official" contribution rates determined pursuant to the requirements of the Act, the Secretary did not err in interpreting Section 301(j) to exclude "estimated" contribution rates from its time limitations. Having mandated that a thorough investigation be conducted before the Bureau may issue a contribution rate and approve a transfer application, once that rate is determined, the legislature intends the time limitation of Section 301(j) to apply to restrict the Department's ability to change that rate because of its own error given

---

**9.** We note that "the interpretation given to a statute by the agency charged with its application is entitled to great weight and should be disregarded or overturned only if such construction is clearly erroneous." *Armco, Inc. v. Pennsylvania Dept. of Labor and Industry*, 713 A.2d 1208, 1209 (Pa.Cmwlth.1998). Moreover, the Department has been given broad powers to adopt such rules and regulations it deems necessary or suitable in its administration and enforcement of the Act, so long as those rules or regulations are not inconsistent with the provisions of the Act. *See* 43 P.S. § 761.

**10.** OSI argues, in effect, that a contribution rate cannot be issued after the end of the relevant year; however, this Court has affirmed the issuance of a contribution rate up to three years after the relevant year, finding that the Bureau had responded "promptly" as required under Section 301(e)(2) of the Act considering the complicated nature of the transfer. *See Garden State Tanning, Inc. v. Department of Labor and Industry, Bureau of Employer Tax Operations*, 668 A.2d 298 (Pa. Cmwlth.1995).

that employers should be able to rely on the Department's approval. In contrast to "official" contribution rates, employers are notified that the "estimated" contribution rate can be changed because they are issued before the transfer has been approved. Furthermore, the quarterly reports state that the Department's "official" notification will be issued on the Bureau's contribution rate notice form, that "estimated" contribution rates are utilized in the interim, and that a bill can be issued later for any additional amount due because of a difference between the "estimated" and "official" rate.[11] Because "estimated" rates do not have the finality which the legislature sought to protect under Section 301(j) of the Act, the Secretary did not err in interpreting them to be excluded from its applicability.

Further supporting the interpretation that "estimated" contribution rates issued by the Bureau are not covered under Section 301(j) is the divergent purpose they serve as compared to "official" contribution rates. Unlike "official" contribution rates, "estimated" contribution rates are issued by the Bureau so that employers under investigation can continue to receive federal tax credits under the Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3301–3311. Under Section 3301 of FUTA, an employer must be making payments into the state unemployment compensation fund in order to receive federal tax credits against its federal unemployment tax obligation. Otherwise, the employer must pay the full 6.2% required. *See* 26 U.S.C. § 3301. Because an employer must be making contributions in order to receive the tax credit, the Bureau issues an estimated contribution rate while its

investigation of the official contribution rate is pending. As such, these estimated contribution rates are issued not as official rates, but only interim rates utilized for administrative convenience.

■ The use of these interim rates is illustrated by the factual scenario that caused the Bureau to issue OSI an "estimated" contribution rate. In the present case, a Bureau investigation of OSI's "official" contribution rate was pending because of an on-going dispute concerning the contribution rate of OSI's predecessor, Transworld, whose contribution rate it decided to adopt. As the new business owner of Transworld, OSI was aware of the dispute as early as December 31, 1994, when Transworld appealed its official contribution rate. Furthermore, having never received approval by the Bureau of its transfer application and being notified on the quarterly reports issued by the Bureau that its "estimated" contribution rate was subject to change after issuance of the Department's "official" notification form, OSI was not issued an "official" contribution rate at that time. Rather, the "official" contribution rate was promptly given when the Bureau could determine Transworld's contribution rate on November 1, 1995, the same day that OSI was issued its "official" contribution rate notice, which was never revised. Because OSI's "estimated" contribution rate is not the same as its "official" contribution rate, and its "official" contribution rate was never revised, the Secretary did not err in denying OSI's review and redetermination of its 1994 unemployment compensation contribution rate because Section 301(j) did not apply.[12]

---

11. OSI relies on letters sent by Bureau officials indicating its "contribution rate" for 1994 without specifying that the rate was "estimated" as evidence that it was not timely notified that the estimated rate could be changed. However, because these letters were sent in 1995, they could not have been the basis of OSI's decision making in 1994. Furthermore, where the quarterly reports specify that official notification of a contribu-

tion rate will be issued by a contribution rate notice, the letters are not evidence that the estimated contribution rate should be considered the official contribution rate.

12. OSI also contends that the Bureau should be barred from revising its estimated contribution rate under the doctrines of laches and estoppel because the Bureau issued an "estimated" rate for OSI's first quarterly report in

Accordingly, the decision of the Secretary of the Department of Labor and Industry is affirmed.

### ORDER

AND NOW, this 7th day of April, 2000, the order of the Department of Labor and Industry, No 98–A–0015–1, dated August 4, 1999, is affirmed.

April 1994, on which OSI then relied, only to unreasonably delay issuing the "official" contribution rate 19 months later on November 5, 1995. *Glidden Co., Inc. v. Department of Labor and Industry,* 700 A.2d 555 (Pa.Cmwlth. 1997), *petition for allowance of appeal denied, In re Glidden Co., Inc.,* 553 Pa. 684, 717 A.2d 535 (1998). Contrary to this contention, because employers are notified by the Bureau that estimated contribution rates can be changed upon official notification of a contribution rate, and the Bureau promptly notified OSI of its official contribution rate on the same day its predecessor's contribution rate was finally determined, i.e., November 5, 1995, neither the doctrine of laches nor estoppel applies.